**UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE**

THE UNITED STATES OF AMERICA,
and THE STATE OF TENNESSEE, ex rel.          CIVIL ACTION NO.:
SHANNA PRAGER,

                                             JURY TRIAL DEMANDED

        Plaintiff/Relator,

v.

UNITED SEATING AND MOBILITY
D/B/A NUMOTION,

        Defendants.

_____

# <u>SEALED DOCUMENT</u>

1

4888-8005-7639, v. 7

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**FILED IN CAMERA AND UNDER SEAL**

THE UNITED STATES OF AMERICA,
and THE STATE OF TENNESSEE, ex rel.          CIVIL ACTION NO.:
SHANNA PRAGER

                                                                        JURY TRIAL DEMANDED

            Plaintiff/Relator,

v.

UNITED SEATING AND MOBILITY, LLC
d/b/a NUMOTION,

            Defendant.

_____

**COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER**
**THE *QUI TAM* PROVISION OF THE FEDERAL FALSE**
**CLAIMS ACT AND SIMILAR STATE PROVISIONS**

1.      This is an action brought on behalf of the United States of America by Plaintiff Shanna Prager ("hereinafter referred to as "Relator") against UNITED SEATING AND MOBILITY D/B/A NUMOTION ("Defendant" or "NuMotion") pursuant to the *Qui Tam* provisions of the Federal Civil False Claims Act, 31 U.S.C.§§ 3729-33 ("Federal FCA" or "FCA"), and on behalf of the above-named States under their respective State False Claims Acts ("State FCAs") (together referred to herein as "Qui Tam Action").

2.      Pursuant to 31 U.S.C. § 3730(b)(2), and comparable provisions in State FCAs, this action is brought in camera and under seal.

3.      Relator is a past employee of NuMotion who was recruited to work for NuMotion as a Corporate Compliance Officer//Investigator. Relator has over eighteen (18) years of

2

experience investigating Medicare fraud, including the types of fraud described herein.

4.    NuMotion is a national provider of Complex Rehab Technologies ("CRT"), and its products are used for providing mobility and accessibility to people with disabilities. The wheelchairs that are sold by NuMotion are considered Durable Medical Equipment ("DME"). The allegations of this Complaint arise from Relator's first-hand knowledge, as a Compliance Officer/Investigator for NuMotion, of the practices of the Defendant.

5.    NuMotion and its entities have violated the Federal FCA and numerous State FCAs, as well as the Medicare and Medicaid Anti-Kickback Act by engaging in numerous unlawful activities from at least 2014 to the present.

6.    The Defendant's unlawful activities include, without limitation: 1) failure to comply with 42 CFR 410.38 pertaining to Durable Medical Equipment; 2) billing Medicare and receiving Medicare payments but failing to deliver DME and/or DME related parts to the named Medicare recipient as billed; 3) overbilling for DME's and intentionally failing to report, or under-reporting, the overbilling once realized; and 4) engaging in a pattern and practice of submitting fraudulently completed, forged, or improperly authored patient evaluations as apparent justification for the sale of DMEs.

7.    Defendant's actions and omissions threaten the integrity of the entire medical profession, pose a threat to public safety, and have caused improper and illegal billings to the state and federal governments.  These practices are detailed in the pages below, and in Relator's Disclosure Statement served on the state and federal Plaintiffs in this matter.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction

4888-8005-7639, v. 7

over the State FCA claims pursuant to 28 U.S.C. §1367.

9.    Venue is appropriate as to the Defendant in that the Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendant in this judicial district.  Therefore, within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

10.    To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. § 3730(e), there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party.

11.    Relator brings this action based on direct, personal knowledge, and also on information and belief as a corporate compliance officer and investigator.  None of Relator's actionable allegations set forth in this Complaint are based on public disclosure as set forth in 31 U.S.C. § 3730(e)(4).  Relator is the original source of facts alleged in this Complaint and in her Disclosure Statement, as she, through her employment with Defendant, is privy to the Defendant's numerous false claims and false claim schemes, as specifically detailed in this Complaint.

<u>**THE PARTIES**</u>

12.    Relator Shanna Prager is a citizen of the United States of America and the state of Arizona and is a former employee of NuMotion.  Relator has been working in the fraud detection and compliance industry for over 18 years and has spent much of her career identifying "bad providers," which are providers who systematically, purposefully, repeatedly, and knowingly engage in fraudulent billing activities, specifically to government payors. Relator has vast experience in internal investigations for fraud and compliance with Medicare/Medicaid, including working to investigate fraud for Anthem, Inc. and training HHS OIG agents, FBI Agents, and AUSAs on how to identify fraud using data analytics on behalf of CMS under a General Dynamics

4

4888-8005-7639, v. 7

Federal Contract and for Centers for Medicare & Medicaid Services as a Unified Program Integrity Contractor ("UPIC") which served as the investigative contractor for CMS. After proving herself as an exemplary fraud detection compliance officer/investigator, Relator was terminated from her role at NuMotion, not coincidentally, in the middle of an internal substantial investigation into DME equipment, which was billed to Medicare and paid by Medicare as having been delivered yet was found to be undelivered and sitting in a warehouse in Los Angeles, California.

13.     Relator brings this *Qui Tam* action based upon direct and unique information obtained during her employment as a Corporate Compliance Officer and Investigator.  Relator is providing a "disclosure statement" to the United States and to the Plaintiff State as required by law.

14.     Defendant, NuMotion, offers wheelchairs, strollers, walkers, car seats, ramps, hospital beds, and mobility devices, which are included within the statutory definition of durable medical equipment or "DME" pursuant to 42 CFR 410.38.  NuMotion is a for-profit corporation headquartered at 1111 Cromwell Ave #601, Rocky Hill, CT, but conducts its business primarily from its Executive Office at 155 Franklin Road, Suite 300, Brentwood, Tennessee 37027. NuMotion is an approved Medicare direct-billing DME provider under provider numbers, **1720221708, 1992879639, 1619107646, 1467526707, 1326206624, 1912949702, 1770740276, 1568536860, 1710051032** and possibly others.

15.     NuMotion conducts business through its branches in forty-five (45) states, including the states of Tennessee, Alabama, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North

4888-8005-7639, v. 7

Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, Wisconsin and Wyoming.

## FEDERAL AND STATE LAWS

16.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment to persons over sixty-five (65) years of age and others who qualify under the terms and conditions of the Medicare Program.

17.     The federal Anti-Kickback Statute (AKS) (See 42 U.S.C. § 1320a-7b.) is a criminal statute that prohibits the exchange (or offer to exchange), of anything of value, in an effort to induce (or reward) the referral of business reimbursable by federal health care programs.

18.     The Federal FCA, 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

19.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes it illegal for any person to "knowingly" use, make or cause to be used or made, a false record or statement in order to induce or obtain a false or fraudulent claim paid or approved by the Government a violation of federal law. In such cases the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim

4888-8005-7639, v. 7

($5,500 and $11,000 for claims made on or after September 29, 1999).

20.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person, who conspires to defraud the United States by inducing or obtaining a false or fraudulent claim to be allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

21.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" use, make, or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law. In such cases the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

22.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse, or has the authority to reimburse,, such contractor, grantee,  or other recipient for any portion of the money or property which is requested.

23.     As set forth below, several states have passed False Claims Act legislation, which in most instances closely follows the Federal FCA: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*, District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq.*, Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, Hawaii False Claims Act, Haw. Rev. Stat.§§

7

661-21 *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §  175/1 *et seq.*, Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, § 437.1 *et seq.*, Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A *et seq.*, Michigan Medicaid False Claims Act, MI ST Ch. 400, Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq,,* New Hampshire False Claims Act, N.H. RSA §§ 167:61-b, *et seq.*, New Mexico Medicaid False Claims Act,  2004 New Mexico Laws Ch. 49 (H.B. 468), Tennessee Medicaid False Claims Act, Tenn. Code Ann.  §§71-5-181 *et seq.*, Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§36.001 *et seq.*, and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01- 216.1 *et seq.*

24.     These State False Claims Acts apply, *inter alia,* to the state portion of Medicaid fraud losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program. Each of the statutes listed above contains *qui tam* provisions governing, *inter alia*, a relator's right to claim a share of the State's recovery.

## **FACTS AND ALLEGATIONS**

25.      NuMotion is a leading provider of complex rehab technology ("CRT") offering adult and pediatric wheelchairs and products, with over 150 locations across the country serving approximately 260,000 people.   NuMotion, a DBA of its parent company, United Seating and Mobility, LLC, was acquired by AEA Investors LP in November of 2018. AEA Investors LP was founded in 1968 by the Rockefeller, Mellon, and Harriman family interests and S.G. Warburg & Co.

26.     The Social Security Act defines those items and services covered by Medicare and identifies certain conditions for payment. Under 42 CFR 410.38(d)(1) the required elements for a DMEPOS order/prescription are defined and provided.

4888-8005-7639, v. 7

27.     In order to bill Medicare, all DMEPOS suppliers must comply with 42 CFR 410.38(d)(1) elements.  Failure to comply with the aforementioned regulations demonstrates substantial non-compliance with Federal regulations for Medicare billing. The CRT's sold by NuMotion fall under the Medicare billing requirements as defined and provided in 42 CFR 410.38(d).

28.     Relator was the Corporate Compliance Officer for NuMotion from September 4, 2019 through May 9, 2022.

29.     In her role as Corporate Compliance Officer/Investigator, Relator was responsible for investigating "concern reports" that disclosed potential false claims to Medicare and Medicaid. Following the corporate process defined for this task, she would verify and validate the matter to determine if a compliance issue was present. If an issue was determined to be present, she would investigate and determine the extent of a false claim and, when such claims were found, initiate a process resulting in corporate self-disclosure of the false claim to Medicare/Medicaid.  Such self-reporting occurred on multiple occasions as a consequence of relator's investigations into NuMotion activities.

30.     During her tenure, Relator discovered evidence that Defendant and its employees have systematically, purposefully, repeatedly, and knowingly engaged in fraud committed against the government in the form of filing false claims for reimbursement. These claims include, but are not limited to, billing for wheelchairs, and parts of wheelchairs, that were stated to the government as having been delivered to end-users—a legal precondition of reimbursement—but which were, in fact, not so delivered. This fraud has been a knowing and systemic issue occurring throughout the company and has been specifically identified as a compliance problem during Compliance Department Team meetings, which included Defendant's Chief Compliance Officer and General

Counsel. Awareness of this problem was also known and discussed at Board of Directors meetings involving all Senior Leaders, Vice Presidents, and corporate officers, including the Chief Executive Officer, Mike Swinford. Despite this top-level corporate awareness of existing and/or potential fraud in the company's reimbursement policies and practices, the fraud continued. The purpose of Defendant's fraud has been the generation of additional revenues flowing to the company, all at the expense of the government and other payors.

31.     The fraudulent billing personally observed throughout Relator's tenure with the Defendant involved multiple branches in multiple states. Despite having knowledge of systemic billing problems causing the creation of false claims, senior leaders at the company and in the Compliance Department, including the Chief Compliance Officer and CEO, have not sufficiently addressed nor mitigated the violations and non-compliance practices. As a result, Relator, in her experienced and informed professional opinion, has concluded that NuMotion, is, as generally defined within the industry, a "bad provider."

32.     In Relator's judgment, based on years of work in fraud detection and compliance, practices which exist in multiple locations and involve multiple company employees or agents in almost every instance reflect company-wide practices. Her multiple investigations at NuMotion are strong evidence that the fraudulent practices described herein reflect company-wide behavior. She found no evidence that would suggest that the company meaningfully promoted different practices.

33.     Specifically, while at NuMotion, Relator uncovered fraudulent patterns and practices, including:

       a. Assistive Technology Professionals (ATP's)—the salespeople of the company were forging or "scribing" clinical therapy documentation that is required by law

10

to be completed by a clinician, physical or occupational therapist, or a physician. This practice of "scribing" has been prohibited by CMS since at least November, 2019 and is considered a violation of the Anti-Kickback Statute, because clinicians can perform more evaluations than normal and hence increase their business when assisted by the documentation created by the ATPs. The forgeries were also done, at times, without legally required face-to-face clinical therapy evaluations. This illegal "short-cut" practice was performed for the purpose of inducing Medicare to pay for more expensive wheelchairs than were likely warranted had there been true and honest physical-needs evaluations, as the law requires.

b.  The Defendant received orders for DME's, including wheelchairs and wheelchair parts, and billed Medicare for those chairs and parts even though the Defendant failed to deliver some or all of the equipment to the buyers. Full and complete delivery of a product is a precondition of payment by Medicare, and the Defendant, like others similarly situated, must, in order to obtain lawful payment, certify that delivery has been successfully completed.    Instead, Defendant knowingly generated fraudulent claims based on false and/or inaccurate "delivery tickets" claiming that all the products and parts were delivered when, in fact, they were not. Such false billings were ultimately paid by Medicare.

c.  When caught in fraudulent practices, Defendant's knowingly and deliberately under-reported violations in furtherance of its fraudulent billing scheme.

### NUMOTION ATP'S SCRIBING AND FORGING CLINICAL THERAPY DOCUMENTS IN VIOLATION OF FCA

34.    Defendant employs Assistive Technology Professionals (ATP's)—referred to

11

4888-8005-7639, v. 7

herein as salespersons--whose job it is to assist in the selection of appropriate assistive technology for the needs of consumers and to provide training in the use of selected devices.

35.     The ATP's earn commissions, which are based on a percentage of the total revenue of products sold each month directly by the ATP, thus giving each ATP the personal financial incentive to sell as many higher-priced products as possible before the end of each month.

36.     Because Defendant's and the employed ATPs receive a financial benefit from its sales, the FCA prohibits their active involvement in the process of justification of DMEs.

37.     In this regard, Defendant, through ATP's, consistently engaged in the falsification of claims when scribing and authoring documentation.

38.     One of Relator's first investigations with Defendant in October 2019 involved a wheelchair for which the company knowingly billed Medicare despite knowing that it had not been delivered. The paperwork, including the delivery ticket and order notes in Defendant's internal system, reflected that the patient had come into the office to sign for his wheelchair on the 30th of the month, but had not taken delivery of it. This was proved to be false by an ATP who visited the patient and discovered that the patient had not visited the office, and that the wheelchair had not been delivered nor had the patient taken possession of it. Relator's investigation uncovered that the documentation had been forged and falsified by one of Defendant's branch managers in Sacramento, California, in order for the wheelchair to be billed by the end of the month, thereby creating a false claim.

39.     The practice of ATP's forging and otherwise scribing reports for clinicians, physical or occupational therapists, and physicians was commonplace for Defendant and its many serial offenders. One such example who Relator confirmed was involved in the billing of false claims was NuMotion ATP Adam Robledo.

12

4888-8005-7639, v. 7

40.    ATP Robledo, who at the time was working in Defendant's New Mexico location, was providing unauthorized and prohibited clinical justifications for equipment in order to justify higher dollar and higher-level equipment than necessary.

41.    ATP Robledo became familiar with, and practiced at, using exactly the right verbiage to insert into clinical evaluations in order to justify the more expensive wheelchairs, thereby fraudulently increasing profits for Defendant and increasing commission for the individual ATP, in this case Robledo.

42.    Relator found that ATP Robledo was illegally providing verbatim justifications to clinicians, physical or occupational therapists, and physicians via emails in Word document format in order to allow the clinician to simply copy and paste the effective verbiage into their clinical documentation.

43.    The clinician (or other qualified evaluator) would follow this practice because it saved them time and was less work on their end, even though it was illegal. Because the clinical documentation that was submitted to Medicare was actually authored by Robledo, this was a clear and direct violation of the FCA and Anti-Kickback statute, and resulted in false claims being submitted by the Defendant.

44.    Due to Relator's investigation, Defendant self-reported *some,* but not all, of Robledo's violations to Medicare, totaling approximately $4-6 million in false claims. During this particular investigation of ATP Robledo, Relator reviewed many of Robledo's emails and the documents that were transmitted between Robledo and the clinicians and uncovered this fraudulent activity. In her experience, when an employee engages in a pattern of activity that creates false claims, that pattern likely persisted before the most recent discovery and consequently warrants further investigation into past conduct of the employee, in this case Robledo.

13

4888-8005-7639, v. 7

45.     Relator learned that ATP Robledo had been transferred from NuMotion's California office to its New Mexico office and asked to begin review of Robledo's emails prior to the transfer in order to ensure that his violative practice had not caused false claims to be submitted in California and, if so, had not resulted in an under-reporting of the violation. Based on her initial review of Robledo's documentation submitted while he was in California, Relator was able to confirm that he was, indeed, involved in the same violative practices there, which resulted in NuMotion submitting and being paid on false claims.

46.     To complete the investigation, Relator requested to perform a 100% review of ATP Robledo's emails from his work in California to ensure Defendant did not underreport the fraud. Because of the sheer volume discovered, Relator told Curtis Watkins, who at the time was a Director of Compliance for the Defendant, that she believed more false claims existed where the justifications were provided in person during an evaluation or via "hand-carry" or scribing. Relator brought up concerns that she had reason to believe that all of ATP Robledo's orders in California (or other locations where he may have worked) were compromised as false.

47.     Defendant's practice throughout the course of Relator's career at NuMotion was to relay all of its directives as to how she was to perform her job duties through her direct supervisor, Watkins.  Relator and Watkins participated in Compliance Department Meetings involving Chief Compliance Officer and General Counsel, as well as Board meetings with senior leaders and officers of the company, including CEO Mike Swinford.  Many of the directives to Relator came from the top down and were relayed to Relator by Watkins, who would go on to become Vice President of Compliance at the company.

48.     In response, rather than providing Relator with Robledo's emails, Watkins advised Relator to minimize her findings in order to under-report overpayments and do so in order to allow

14

the Defendant to protect and continue to employ employees like ATP Robledo who was generating an estimated $3 million in sales revenue per year and contributing substantially to the company's bottom line. Management told Relator that if there were more self-disclosures discovered, an unwanted Corporate Integrity Agreement ("CIA") would be forthcoming. A CIA was a much more severe enforcement administrative action by HHS OIG in which case Defendant said it would be forced to terminate not only the offending ATPs, but Compliance Department personnel (like Relator) who were tasked with ensuring Defendant's adherence to proper billing practices. To this end, Defendant told Relator directly not to continue investigating Robledo's California activities in order to avoid discovery of additional violations and a need for further self-reporting.

49.     Despite this instruction to "stand down," Relator began an investigation into Robledo's activities through his emails in California and discovered unequivocally that he was engaging in the identical fraudulent false claims for his orders in California.

50.     To Relator's knowledge, Defendant under-reported the false claims of the ATP's activities while Robledo was working in New Mexico and failed entirely to report his false Medicare claims arising from his activities in his previous position in California.

51.     In addition to government payors like Medicare, Medicaid, and Veterans Health Administration (VHA), private insurance companies were also defrauded through the same illegality, yet Relator was expressly told not to report the fraud of private payors.

52.     After this self-reporting of more than $6 million in overpayment, Relator was directed never to do as thorough a review again. Relator was told that from this point forward, a "statistically valid random sample" of claims would be canvassed covering ATP's orders. This is a commonplace practice seen by the Unified Program Integrity Contractor (UPIC) during reviews of claims. (UPICs are Medicare contractors hired to investigate fraud.). However, Relator told

15

Watkins that while this might be an efficient way to review fraud within a UPIC, it was not an efficient or effective way to detect fraudulent orders within a DME provider like NuMotion,

53.    After commencing employment at NuMotion, Relator implemented a fraud detection process within the Compliance Department whose purpose was to detect the submission of false claims through a comprehensive review of the email documentation sent to clinicians by the ATPs or other employees.  If emails from the ATP stated that they authored or scribed or forged the documents or provided language supporting justifications, or requested that the clinicians cut and paste ATP suggested language into their evaluations or clinical documentation, the Relator would seek to verify whether the documents and justifications supplied by the ATP were copied verbatim on the final documentation that was uploaded into Defendant's order system and submitted to Medicare or the payor.  This process would take slightly longer than a sample review, but it would without a doubt insure a much more thorough and comprehensive process for capturing fraud. Watkins' suggestion that Relator limit her review to only a "statistically valid random sample" would omit any review of emails from the ATPs, and thus, as Relator's investigations had already demonstrated, multiple fraudulent documents would be missed. Watkins' suggestion was clearly part of a knowing, deliberate effort to avoid the detection and reporting of illegal false Medicare claims. A random sample was utilized by Medicare for investigations for providers with thousands to millions of claims with a universe too big for individualized review. But that was not the case with Defendant, where it was possible to locate and review emails for all the fraudulent claims. Relator believed that "best practices" required this deeper in depth review.

54.    Relator told Defendant of her concerns that sampling was not effective, but she was told going forward to focus only on claims associated with the sample. Defendant wanted Relator

to conduct a quick review, and the more comprehensive review suggested by Relator would not only result in Defendant's having to report more and more over-payments, but could, as noted, lead to a CIA. Defendant told Relator that by taking too long to complete reviews of over-payments she was thinking "too much like an investigator," and that perhaps Defendant should fly her to the executive offices in Nashville so she could be trained to think more like an "auditor," causing her to complete order reviews in a faster, less thorough manner.

55.     Despite knowing ATP Robledo had violated the FCA and other laws and regulations by engaging in a systemic fraud, Defendant did not terminate him. Based on Relator's information and belief, this same ATP continued to engage in similar false claim practices until his eventual resignation from the company.

56.     Robledo was not an isolated incident. Relator investigated Skylar Post, another of Defendant's ATPs who illegally forged or scribed for clinicians' verbiage used to justify more expensive DME's. His fraudulent language included what justifications to choose, what clinical assessments were observed, diagnoses for patients, and other significant entries designed to ensure that the ATP received the highest commission even where the DME involved was inappropriate.

57.     Skylar Post was discovered to have improperly authored clinical assessments. This incident was not self-reported by NuMotion even though it was reported by Relator to the company and acknowledged by NuMotion.

58.     Relator investigated Matthew Wattenbarger, another one of Defendant's ATPs who was authoring clinical evaluation forms and scribing for therapists. In response to her uncovering these blatant false claims violations, Defendant self-reported some, but not all, of the false claims submitted by Wattenbarger.  However, subsequently her superiors expressly instructed Relator once again to stop her investigation in order to avoid the need for further self-reporting.

17

4888-8005-7639, v. 7

59. Relator investigated ATP Jay Bloomfield and discovered that he was providing line-item justifications to a physiatrist that were then copied and pasted into the physiatrist's clinical documentation, thereby justifying higher level equipment than was warranted. This was another clear violation of the FCA. and other relevant laws and regulations. Bloomfield's scheme was virtually identical to the one perpetrated by ATP Robledo. ATP Bloomfield was providing unwarranted justifications to clinicians in order to obtain orders for higher level equipment, specifically Group 3, which contained the highest level and most expensive complex power wheelchairs, thus generating higher commissions and revenue for the company. If acting diligently and independent of Bloomfield's influence, the clinician could not have justified the proposed equipment, either because the patient did not need it, want it, or qualify for it, given his or her current conditions. ATP Bloomfield provided the clinicians with justifications they could easily and simply copy and paste into the clinical evaluations. Many of the orders reviewed by Relator were identified as suspect, given their apparent lack of medical necessity of the level of chair being provided, and given evidence of Bloomfield's scheme discovered during a cursory review of his email. Relator suggested a medical necessity review to management, and a medical reviewer was asked to review several of ATP Bloomfield's orders, yet Relator was terminated before the outcome could be known by her. Upon information and belief, these false claims were not reported.

60. Rather than terminate employees such as these who were engaged in generating false claims, Defendant chose to "rehabilitate" individuals who were caught illegally falsifying documents, or who illegally scribed or authored documents. Defendant rehabilitated, as opposed to severing, such individuals because they were often times very high earners who generated significant revenues for the company. Furthermore, Defendant elected not to track or audit the work of these employees after their fraud was initially discovered to verify that they had indeed

18

ceased engaging in the illegal activities that were allowing false claims to be submitted.

61.    The foregoing cases of fraud are not the only ones known to Relator, some based on personal knowledge and some upon information and belief. Relator stands ready to provide the details of those cases.

62.    The above are all clear and direct false claim act violations and are systemic practices of Defendant, which, upon information and belief, are being perpetrated at all or virtually all of the Defendant's more than 150 branch locations.

## FRAUDULENT AND IMPROPER MEDICARE BILLING

63.    Prior to her being suddenly terminated by NuMotion, Relator was investigating a "concern report" from a NuMotion Operations Manager that revealed 263 billed and paid orders by Medicare for wheelchairs, and parts for wheelchairs, which were not delivered. Instead, they were discovered sitting on a shelf in a warehouse in California.  Relator launched an investigation into this report, which included interviewing witnesses and looking at billed and paid documentation; however, her investigation was only partially completed before NuMotion terminated her employment.

64.    Had Relator been permitted to continue her investigation, standard business practice would have been to: review claims data provided by the data team with Defendant's business intelligence department; request a spreadsheet which included Orders in Process (OIP) that were not yet billed; and review orders billed and paid from six months prior to current all the way back six years. The data was retrieved from the Defendant's so-called VENU system, the database where Defendant tracks all orders from beginning to completion, including notes, attachments, all employees involved in an order, equipment, diagnoses, clinicians, patient information, payor information, all pertinent attachments, such as delivery tickets, authorizations,

19

quotes, detailed product descriptions, clinical evaluations, physician face-to-face encounters, prescriptions, chart notes, ATP home assessments, ATP mobility assessments, and other data.  .

65.     In order to conduct her investigations, Relator also had access to an internal system named SMART where it conducted the billing documentation and case tracking of each order for billing and insurance payor purposes, accounting, payments, and the like. This system tied each order's billing information to each order in Defendant's Order tracking system, that is, VENU. This was utilized by the billing department.

66.     In performing her investigations, Relator would seek to review all billed and paid data, as well as Orders in Process (OIP). Relator would then complete a comprehensive "final overpayment spreadsheet," which is a standard excel spreadsheet used to find identified overpayments. On each spreadsheet, for each determined overpayment, Relator included: (1) Order Number; (2) DME Equipment; (3) Date of Services; (4) ATP information; (5) Relator comments, including detailed information of Relator's email review, evidence discovered and compared in the VENU system to the email evidence, and an examination to see if the verbiage in the ATP's email to the clinician ended up as word-for-word, cut-and-paste language in the final document provided to Medicare or Medicaid (or other payors) and uploaded into the system as a final document; (6) Determination; (7) Amount billed; (8) Payer information; (9) Notes of findings; (10) Email review findings; (11) System findings; (12) Date of services notes; (13) Delivery ticket notes; and (14) Case notes.

67.     All final overpayment spreadsheets generated by the Relator can be found in multiple locations, including: (1) on her laptop (which she relinquished to the Defendant's custody after her termination); (2) Microsoft Teams chats sent to the VP for review; and (3) Defendant's shared network drive.

4888-8005-7639, v. 7

68.     During the initial stage of her investigation into the fraudulent claims in California, but prior to her termination, Relator discovered instances of suspicious and fraudulent claims through her review of Defendant's VENU system.  Relator discovered that there were delivery tickets for the orders in the warehouse that were signed and dated by the ATP and billed to Medicare, Medicaid and other payors. Despite non-delivery, NuMotion submitted certified claims to Medicare that "all parts" were delivered and billed. Based on these fraudulent billings, payment for the non-delivered items were made to the Defendant.

69.     Investigating further into the billed delivery tickets, Relator discovered that the delivery tickets billed to Medicare, Medicaid and other payors for these DMEs had items that were billed yet not delivered and were discovered sitting on the shelf. They remained in the possession of Defendant despite its representation to Medicare that all parts had been delivered. As it is not possible for all parts to have been delivered while simultaneously sitting in a warehouse in California, Relator confirmed this information to be evidence of a systemic false claim practice by Defendant.

70.     Relator made it clear that she was going to continue to investigate this practice of billing and receiving payments from Medicare in the millions of dollars, based on the knowingly false representation that the product was delivered to the customer while rested with Defendant's knowledge in warehouse. To this end, Relator began a more comprehensive review of the claims submitted versus what had been billed and paid. Relator learned that many items that had been billed and paid were the same items sitting in the California warehouse and multiple other locations for nearly two years and had not been delivered to the customer as indicated on the claim submission.

71.     Relator began conducting interviews of Defendant's staff in Los Angeles (Cypress

21

Branch) who confirmed that non-delivery was a more significant problem than initially suspected and that there are other significant inventories of DME equipment in other offices (such as Santa Clara and Sacramento) that were billed out to Medicare and Medicaid although never delivered to the customer.

72.    During an update with Watkins, who was by then Defendant's Vice President of Compliance, the Relator indicated her decision not to limit the investigation to the initial 263 DME orders, which alone represented millions of dollars of exposure to the company but would include all California locations based on initial reliable information gathered by the investigation to date.

73.    Relator expressed concern that the problems discovered could be a national problem for Defendant (potentially implicating all 152 locations), as she had seen and heard of similar allegations of non-delivered, warehoused equipment having been billed out to Medicare, Medicaid, and other payors and marked as "delivered" even though it was not.

74.    After Relator updated Watkins to the potential size and exposure of this new investigation, he expressed his concern that the investigation would likely not be solved with a self-reported admission of an "overpayment" by Medicare that could be reimbursed.  Rather, based on the severity of the problem, he expressed his concern that, the investigation would lead to a CIA requiring Defendant to address more severe corporate integrity issues.  What is more, a CIA could significantly impair the valuation and potential sale of the company that was being contemplated at the time.

75.    In the middle of her investigation into these fraudulent practices, and just days before she was scheduled to conduct more witness interviews into the scheme, Relator was suddenly terminated from NuMotion.

76.    As the ostensible reason for her termination, Relator was told by Defendant that her

22

position was being dissolved. Shortly after, however, Relator confirmed this alleged reason to be false given that a new job posting for her same position was released the next day.

77.     Rather than acting in compliance with the above-mentioned Federal regulations, Defendant systematically failed to fulfill requirements under FCA and other laws and regulations.

78.     The activities described above constitute direct violations of 42 CFR 410.38 and 42 U.S.C. § 1320.

### PRACTICE OF INTENTIONAL UNDERREPORTING

79.      Relator initiated at least six self-disclosures as a result of her investigation in 2021. Additionally, another ten self-disclosures had been initiated by members of her team during 2021.

80.     Relator was expressly told not to include additional evidence that unequivocally revealed underreporting on recent filings of overpayments to Medicare.

81.     Additionally, Relator was told to review and report only on potential fraud involving government payors, and to reveal overpayments made to Defendant only by government payors. The commercial payors were never to be informed of overpayments.

82.     As Relator investigated and discovered Medicare overpayments, she was criticized for her technique and tactics as being too comprehensive and thorough.

83.     On May 9, 2022, while Relator was uncovering evidence of clear false claims comprising what she believed to be the largest fraud scheme in the company's history, she was informed without warning that she was being terminated and was instructed to immediately discontinue her investigation.

### COUNT I - VIOLATIONS OF THE FEDERAL FCA

84.     Relator repeats and realleges paragraphs 1 through 66 of this Complaint.

85.     From at least 2019 until the time Relator was fired, Defendant NuMotion acted in

4888-8005-7639, v. 7

reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed and caused the submission of false or fraudulent claims to be paid or approved by the Government in violation of 42 CFR 410.38, all through the wrongful billing schemes and other practices as described above.

86.    From at least 2019 until the present, Defendant NuMotion acted in reckless disregard or deliberate ignorance of the truth or falsity of the information involved and conspired with clinicians and others to defraud the Government Health Care Programs by causing false or fraudulent claims for reimbursement to be paid or approved by the government, all in violation of 31 U.S.C. § 3729(a)(3) and 42 U.S.C. §1320a-7b.

87.    From at least 2014 until present, Defendant NuMotion has knowingly and willfully offered to pay, and has paid, remuneration (including kickbacks, bribes, and rebates) directly and indirectly, overtly and covertly, in cash and in kind, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved in violation of 31 U.S.C. § 3729(a)(3) and 42 U.S.C. §§ 1320a-7b and 1320a-7k.

88.    Defendant's failure to return overpayments as alleged herein and defined under and governed by 42 U.S.C. §1320a-7k more than sixty (60) days after said overpayments were identified constitutes separate false claims in violation of 31 U.S.C. § 3729 and 42 U.S.C. §§ 1320a-7b and 1320a-7k.

89.    Relator has not seen any indication that the Defendant intends to change its fraudulent schemes against Government Health Care Programs. Relator specifically alleges, therefore, that False Claims Act violations are continuing for which the U.S. Treasury should be made whole.

90.    The United States and its fiscal intermediaries were unaware of the Defendant's

24

conspiracy or the falsity of its records, statements, and claims made by Defendant's and their co-conspirators and, as a result, have paid and continue to pay Government Health Care Programs reimbursement that they would not otherwise have paid.

91.     The United States and state Medicaid programs have been damaged by the payment of false and fraudulent claims.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant NuMotion:

**To the United States:**

(1) Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which the Defendant's caused to be presented to the United States;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to § 3730(d) of the FCA and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorney's fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT II- TENNESSEE FALSE CLAIMS ACT**

25

92.     Relator repeats and realleges each allegation contained in paragraphs 1 through 66, above as if fully set forth herein.

93.     This is a qui tam action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 et seq. and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

94.     § 4-18-103(a) provides liability for any person who-

d.     Knowingly presents, or causes to be presented to an officer or employee of the state..., a false claim for payment or approval;

e.     Knowingly makes, uses, or causes to be made or used, a false record or statement to induce a false claim to be paid or approved by the state or by any political subdivision;

f.     Conspires to defraud the state or any political subdivision by inducing a claim to be allowed or paid by the state of by any political subdivision.

§ 71-5-182(a)(1) provides liability for any person who-

i.   presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

ii.  makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

iii. conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

95.     The Defendant NuMotion violated Tenn. Code Ann. § 4-18-103(a) and § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by virtue of its deliberate and systematic violation of federal and state laws, including the FCA, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

96.     The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, was unaware of the Defendant's conduct and paid the claims submitted by healthcare providers and third-party payers in connection therewith.

26

4888-8005-7639, v. 7

97.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, an express condition of payment of claims submitted to the State of Tennessee in connection with the Defendant NuMotion's conduct.  Compliance with applicable Tennessee statutes and regulations was also an express condition of payment of claims submitted to the State of Tennessee.

98.     The State of Tennessee was unaware of Defendant's conspiracy or the falsity of its records, statements, and claims made by Defendant and their co-conspirators and as a result thereby have paid and continue to pay Government Health Care Programs reimbursement that they would not otherwise have paid.

99.     As a result of the Defendant's violation of Tenn. Code Ann. § 4-18-103(a) and § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

100.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 4-18 - 103 (a) and § 71-5-183(a)(l) on behalf of herself and the State of Tennessee.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant NuMotion:

**To the State of Tennessee:**

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $2,500 and not more than $10,000 for each false claim which Defendant's caused to be presented to the State of Tennessee;

27

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 71 -5-183 (c) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  July 6, 2022.

Respectfully Submitted,

BRANSTETTER, STRANCH & JENNINGS, PLLC

By: */s/Joe P. Leniski, Jr.*

Joe P. Leniski, Jr. (TN BPR #22891)
Michael G. Stewart (TN BPR #16920)
The Freedom Center
223 Rosa L. Parks Avenue,
Nashville, Tennessee 37203
Email:  joeyl@bsjfirm.com
            mikes@bsjfirm.com

EDWARDS POTTINGER, LLC

By:  */s/ Bradley Edwards*

Bradley J. Edwards (PHV forthcoming)
J. Stanley Pottinger (PHV forthcoming)

28

425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
Fax: (954) 524-2822
Email: brad@epllc.com

*Counsel for Relator Shanna Prager*

4888-8005-7639, v. 7